# Staunton.

## Burton's Executor v. Manson and Others.

September 17, 1925.

1. Presumptions and Burden of Proof—*Payment of a Bond and an Account.*—Plaintiff sought to recover on a bond of defendants and on an open account, and defendants asserted that their bond and the account had been paid.

   *Held:* That the burden of proof to show payment was upon the defendants.

2. Witnesses—*Transactions with Deceased Persons—Corroboration of Witness—Section 6209 of the Code of 1919.*—In an action by an executor to recover on a bond made by defendants, payable to the executor's decedent, where the defendants alleged that the bond had been paid and the chief witness for the defense was one of the defendants, under the terms of section 6209 of the Code of 1919, it was necessary that his testimony should be corroborated before any judgment could be returned in his favor.

3. Witnesses—*Transactions with Deceased Persons—Corroboration of Witness—"Adverse or Interested Party."*—In an action by an executor to recover on a bond, payable to his decedent, one who is a party to the action, whose interest is adverse to the executor and who is seeking a judgment in his favor, based on his own testimony, is an "adverse and interested party," as the term is used in section 6209 of the Code of 1919.

4. Witnesses—*Transactions with Deceased Persons—Corroborative Evidence—Quality of Evidence.*—Corroborative evidence is such evidence as tends in some degree, of its own strength and independently, to support some essential allegation or issue raised by the pleadings testified to by the witness whose evidence is sought to be corroborated, which allegation or issue, if unsupported, would be fatal to the case; and such corroborative evidence must, of itself, without the aid of any other evidence, exhibit its corroborative character by pointing with reasonable certainty to the allegation or issue which it supports, and such evidence will not be material unless the evidence sought to be corroborated itself supports the allegation or the point in issue.

5. Witnesses—*Transactions with Deceased Persons—Corroborative Evidence—Quantity of the Evidence.*—The evidence must be corroborative

in the sense indicated in the preceding headnote in order to be admissible, but there must also be sufficient of this evidence to corroborate. There must be quantity as well as quality. The difficult question to answer is, when is there sufficient evidence of the right quality to amount to corroboration? Clearly, it is not necessary that the corroborative evidence should of itself be sufficient to support a verdict, for then there would be no need for the testimony sought to be corroborated. Each case is to be decided on its own peculiar facts and circumstances.

6. WITNESSES—*Transactions with Deceased Persons—Corroboration of Witness—Instructions—Case at Bar.*—In the instant case the court instructed the jury as follows: "The law does not require the testimony of such an adverse witness to be corroborated in every particular, but that what the law requires is that there should be such corroboration as would confirm and strengthen the belief of the jury in the testimony of the witness. While this instruction might have been sufficiently accurate if the testimony of the witness had been consistent and harmonious, it was not so in the instant case where the testimony of the witness was contradictory and inconsistent, and the instruction, therefore, was, at the best, misleading.

7. WITNESSES—*Transactions with Deceased Persons—Corroboration of Witness—Case at Bar.*—In the instant case, an action by an executor on a bond and an open account of one of the defendants and his wife, the daughter of the testator, payable to the' testator, defendant testified that the debt had been pa.d in full by board furnished the testator, but afterwards admitted that $202.00 of testator's board had been paid in cash. Witnesses for the defendants testified that testator had made his home with defendant and was on the best of terms with him, but they had no knowledge of any arrangement between testator and defendants as to his board except that one of them testified that testator stated to him that he was not paying cash board.

*Held:* That neither the statement of defendants that the debt had been paid in full nor that only $202.00 of the board had been paid in cash, was corroborated by the other witnesses.

Error to a judgment of the Corporation Court of the city of Roanoke in a proceeding by motion for a judgment for money. Judgment for defendants. Plaintiffs assign error.

*Reversed and remanded.*

The opinion states the case.

*H. T. Hall* and *Paul C. Buford*, for the plaintiffs in error.

*Carleton Penn*, for the defendants in error.

BURKS, J., delivered the opinion of the court.

This was an action by Burton's executor against H. W. Manson and the administrator of May Burton Manson, his wife.   The plaintiffs sought recovery on a bond for $607.00 made by H. W. Manson and May Burton Manson payable to W. J. Burton, on demand, and on an open account for $75.00.

May Burton Manson was the daughter of W. J. Burton, the plaintiff's testator, and the defense relied on was that Burton had lived with the Mansons from 1906 to June 1, 1915, and that the bond and account sued on had been paid by board and lodging furnished by the Mansons during that time, and that Burton had declared that the debt had been so paid.

Three witnesses for the defendant testified that from sometime in 1906 to 1915 W. J. Burton made his home with the Mansons, in Petersburg, and that Burton and Manson were on the best of terms.   They also testified that Burton was a very careful and particular man in his business affairs and close in his business dealings with others, but they had no knowledge of any arrangement between them as to how Burton was to pay his board except that one of them states that sometime during the period above mentioned and prior to June, 1915, Burton stated to him that he was not paying cash board to the Mansons.   The same witness also states that Burton was a very close man, but honest and fair

in his dealings. It also appears from the testimony of this witness that Burton was away from the Mansons' home frequently on visits and another witness states that Burton lived in Bristol one year between 1906 and 1915. . The chief witness for the defendants was the defendant, H. W. Manson, who testified that Burton came to Petersburg to live with them in the spring of 1906, and from then until June 1, 1915, made his home with them, and that Burton told him he would pay $5.00 a. month room rent and $15.00 a month for board and laundry; that at the time Burton came to live with them Manson and his wife were indebted to Burton in the sum of $1,083.00, which was evidenced by their bond; that Burton credited the amount due for board on this debt but paid no cash board; that he made and. gave to the witness a statement on March 1, 1911, showing a balance due Burton by witness and his wife of $1,466.02, which statement he filed with his evidence as "Manson exhibit No. 1;" that credits for board were made by Burton to sometime in 1911 and witness had expected to collect during 1911 money from the sale of his residence but did not succeed in selling the place until 1912, when he paid Burton $800.00 in cash. Burton made up and gave to the witness another statement on August 1, 1912, showing the credit of $800.00 and various sums for board, and leaving a balance due to Burton, of $664.03; that the last statement brought. the account down to August 1, 1912, and in June, 1913, the bond for $607.00 sued on was prepared by Burton and executed by the witness and his wife, and delivered to Burton and that Burton then delivered to the witness the old bond for $1,083.00; that Burton continued to live at the home of witness, in Petersburg, until June 1, 1915; that sometime in 1915, but before Burton left his home, Burton said to .the witness: "Henry, that debt is.

paid. You do not owe me anything. If anything I am in debt to you." The witness states that thereafter Burton never mentioned the matter to him and the amount of $75.00 sued for he considered paid as well as the bond when Burton left his home in 1915. On cross examination the witness stated that Burton had never paid any money for board to him; that all amounts due for board were credited on the debts owing by the witness and his wife to Burton; that the balance due according to the first statement on March 1, 1911, was $1,466.02, and on the last statement-as of August 1, 1912, was $664.05; that all board had been properly credited up to August 1, 1912, and that the balance of $664.05 shown on the last statement was correct; that the witness and his wife owed Burton that amount at that time and were then entitled to no further credit; that some adjustment was thereafter made but he could not recall exactly what, and that the bond sued on for $607.00 was executed in June, 1913, and was based on the statement of August 1, 1912, and that the amount of that bond was owing to Burton by Manson and wife, subject only to credit for board and lodging since August 1, 1912; that the only way the bond had been paid was by board and lodging furnished W. J. Burton by witness from August 1, 1912, to June 1, 1915, at the rate of $20.00 per month; that Burton had paid none of this board in cash; that if Burton had given witness or his wife any checks in payment thereof he did not know anything of them. The witness was then confronted with seven checks given by Burton either to Manson or to his wife, each showing that it was for board or board and room rent up to date. The first of these checks was dated October 30, 1913, payable to the order of H. W. Manson and endorsed H. W. Manson per Mrs. H. W. Manson. The last of these checks was dated

December 18, 1915; was payable to the order of H. W. Manson and endorsed by him, and stated on the face of it that it was for board to date. There were also produced a number of checks drawn by W. J. Burton in favor of Mrs. T. G. Folkes, another daughter of W. J. Burton, for board, running from May 4, 1914, to May 11, 1916. None of them was for a large amount but each stated that it was for board. When confronted with these checks Manson admitted that they were in the handwriting of W. J. Burton and that the statements hereinbefore referred to were in his handwriting, but he stated that he had never heard of these checks given to Mrs. Manson in payment of board before; that he had forgotten about the one endorsed by him; that the checks were a complete surprise to him; that they were all for board and that the amounts shown by the checks which were paid to Mrs. Manson and to Mrs. Folkes ought to be deducted from his claim for board. He also admitted that Burton was frequently away on visits at different times.

There was exhibited with the testimony of H. W. Manson the bond above mentioned for $1,083.00, with endorsements of the credits thereon, and statements of the balance, due, including other notes, which showed that the Mansons were indebted to him in the sum of $664.03 as of August 12, 1912. If interest be calculated on this sum at six per cent until June 1, 1913, it would amount to $697.23. There is the following endorsement on the bond for $1,083.00:

"June 7, 1913.

"Credit board amt. to this date and renewed for balance.

"W. J. B."

"June 7 credit for six months board at $15.00 per

month, $90.00." Subtract this $90.00 from the $697.23 would leave $607.23 as of June 7, 1913. The bond sued on is dated June 7, 1913, and is for $607.00.

Manson also stated in his testimony that the account sued on, as well as the bond, was included when Burton said that the debt of Manson was paid and that they owed him nothing. Although he says that this took place prior to June 1, 1915, we find the account sued on has this entry:

"January 25, 1919. Credit by check for $50.00."

So that although he regarded the account as paid on June 1, 1915, we find him making a payment thereon as late as January 25, 1919, for $50.00.

If Burton had made no payments whatever after June 7, 1913, and had remained with the Mansons during all that time, his board and room rent at $20.00 a month would have amounted to $680.00, but the checks above referred to for board amounted to $202.00, so that at the most the credit that Manson could claim on the bond and account was $478.00, and, of course, with interest to be calculated from appropriate dates.

If we look to the endorsements on the bond for $1,083.00, and the statement which accompanied the bond when it was surrendered and the new bond taken, we find that from February 1, 1906, to August 1, 1912, there is credited to the Mansons room rent and board for only twenty-five months, although he had been living with them six years and six months. It is manifest, therefore, from this statement that his board during these six years and six months was not paid altogether by credits on the $1,083.00 bond.

The statements of the other three witnesses corroborate Manson as to the fact that W. J. Burton made his home with the Mansons for the greater part of the time between the spring of 1906 and June 1, 1915; that they

were on very friendly terms and that Burton was not being given his board, but no further.    These witnesses knew nothing of the business relations between Burton and the Mansons.

[1] The main question at issue between the plaintiff and the defendants was whether or not the bond and account sued on had been paid, and on this question the burden of proof was upon the defendants.

[2] The chief witness for the defense was H. W. Manson, one of the defendants, and under the terms of section 6209 of the Code it was necessary that his testimony should be corroborated before any judgment could be rendered in his favor.    The case, therefore, involves the proper interpretation of section 6209 of the Code, which is copied in the margin.[1]

[3] In the instant case, the witness sought to be corroborated comes fully within the designation of the statute, as an adverse and interested party.    He is a party to the action, his interest is adverse, and he is seeking a judgment in his favor based on his own testimony.    He cannot obtain such judgment "founded on his uncorroborated testimony."    His testimony must be corroborated.    But to what extent must he be corroborated?    The facts and circumstances attending one case are so entirely different from those of another, that it would be unwise to attempt a general answer that would be of universal application.    We can only safely deal with each case as it arises.

---

[1] "*Section 6209.   If one party incapable of testifying, testimony of other party to be corroborated; when memoranda, etc., of an incapable party to be received in evidence.*—In an action or suit by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony; and in any such action or suit, if such adverse party testifies, all entries, memoranda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence."

The Virginia statute was taken, in part at least, from the statute of New Mexico, which has been construed several times by the Supreme Court of that State.

[4] In *Gildersleeve* v. *Atkinson*, 6 N. M. 250, 27 Pac. 477, it was said: "Corroborative evidence is such evidence as tends in some degree, of its own strength and independently, to support some essential allegation or issue raised by the pleadings testified to by the witness whose evidence is sought to be corroborated, which allegation or issue, if unsupported, would be fatal to the case; and such corroborating evidence must, of itself, without the aid of any other evidence, exhibit its corroborative character by pointing with reasonable certainty to the allegation or issue which it supports, and such evidence will not be material unless the evidence sought to be corroborated itself supports the allegation or the point in issue."

See also *National Rubber Co.* v. *Oleson*, 20 N. M. 624, 151 Pac. 694; and *Re Cordoner's Estate*, 27 N. M. 105, 196 Pac. 327, and cases cited.

The cases cited correctly state the quality of the evidence to be received. It must be corroborative in the sense indicated, in order to be admissible, but there must also be sufficient of this evidence to corroborate. There must be quantity as well as quality. The difficult question to answer is, when is there sufficient evidence of the right quality to amount to corroboration? Clearly, it is not necessary that the corroborative evidence should of itself be sufficient to support a verdict, for then there would be no need for the testimony sought to be corroborated.

Nothing that was said in *Merchants' Supply Co.* v. *Hughes*, 139 Va. 212, 123 S. E. 355, was intended to decide that the witness to be corroborated must be corroborated on all material points. The case was

decided on its own peculiar facts, and it was not intended to state any rule of universal application. Nor do we now intend to lay down any such rule, but will leave each case to be decided on its own peculiar facts and circumstances. The following Virginia cases were also cited in the briefs: *Robertson* v. *Atlantic Coast Realty Co.*, 129 Va. 494, 106 S. E. 521; *Arwood* v. *Hill*, 135 Va. 235, 117 S. E. 603; *Atlantic Coast Realty Co.* v. *Robertson*, 135 Va. 259, 116 S. E. 480; *Good* v. *Dyer*, 137 Va. 114, 119 S. E. 277. These cases contain valuable discussions of section 6209 of the Code, under which the instant case arises, but do not deal with the amount of corroboration required by that section, which is the only feature of the section here involved.

[6] As to the degree of corroboration required, the learned judge of the trial court in an oral statement to the jury, which has been properly treated as an instruction, said:

"The law does not require the testimony of such an adverse witness to be corroborated in every particular, but that what the law requires is that there should be such corroboration as would confirm and strengthen the belief of the jury in the testimony of the witness."

Probably this would have been a sufficiently accurate statement of the law if the testimony of the witness to be corroborated had been consistent and harmonious throughout. But it was far from it. He claimed that the account sued on was paid in full before June 1, 1915, and yet made a payment of $50.00 on it in 1919. He claimed that no cash had been paid for board and room rent, and yet admitted cash payments amounting to $202.00 which should be deducted from his claim for board. According to his own admissions he was not entitled to the verdict rendered in his favor.

[7] Mrs. Manson and Mrs. Folkes were daughters of

W. J. Burton, and there was no presumption of any contract for board and lodging when he remained with them. *Jackson* v. *Jackson*, 96 Va. 165, 31 S. E. 78. But the fact that he was to pay for board and lodging while actually at the home of the Mansons sufficiently appears from the testimony, and was admitted by the plaintiffs. The main controversy at the trial was what amount, if any, did Burton owe the Mansons for board and lodging from June 7, 1913 to June 1, 1915. On this subject the defendants had the burden of proof. Manson testified that prior to June 1, 1915, Burton said to him; "Harry, your debt is paid. You don't owe me anything. If anything, I am in debt to you." If he had stopped here, the verdict of the jury probably could not have been disturbed, but when he went further and made the admissions hereinbefore pointed out, it cannot be said that his testimony as a whole is corroborated by the testimony of the other witnesses. His testimony as a whole was inconsistent and contradictory, and the instruction that "there should be such corroboration as would confirm and strengthen the belief of the jury in the testimony of the witness" was, to say the least of it, misleading. How could the belief of the jury in such testimony of the witness be confirmed and strengthened? If the testimony of the witness was contradictory, and this is not disputed, what belief of the jury was to be confirmed and strengthened? The fact is that neither statement of the witness that the debt had been paid in full, or that only $202.00 of the board had been paid in cash, is corroborated by the other witnesses.

On the record before us, we are not satisfied that there should not be some credits for board between June 7, 1913, and June 1, 1915, nor, if so, what those credits should be, and hence no final judgment can be

entered in the case on this account, but the judgment of the trial court will be reversed, the verdict of the jury set aside and the case remanded for a new trial not inconsistent with the views hereinbefore expressed.

*Reversed and remanded.*